IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARK BEASLEY,

              Plaintiff,

    v.

LUCKY STORES, INC., et al.,

              Defendants.

Case No. 18-cv-07144-MMC

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S
FIRST AMENDED COMPLAINT;
AFFORDING PLAINTIFF LEAVE TO
AMEND; GRANTING DEFENDANT
NESTLÉ USA'S MOTION TO STRIKE;
CONTINUING CASE MANAGEMENT
CONFERENCE**

Re: Dkt. Nos. 36, 38

Before the Court are two motions, both filed May 23, 2019: (1) a Motion to Dismiss
Plaintiff's First Amended Complaint, filed jointly by all defendants to the instant action,
pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; and (2) a Motion to
Strike Portions of the First Amended Complaint, filed by defendant Nestlé USA, Inc.
("Nestlé" or "Nestlé USA"), pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.
Plaintiff Mark Beasley ("Beasley") has filed opposition to each said motion, to which
defendants have replied. Having read and considered the papers filed in support of and
in opposition to the motions, as well as the parties' respective objections filed in
connection therewith, the Court rules as follows.[1]

### BACKGROUND

The instant case is a putative class action lawsuit brought by Beasley, a California
citizen, as a purchaser and consumer of Coffee-mate, a line of coffee-creamer products.
Beasley alleges Nestlé "manufactures, markets, and sells" Coffee-mate. (See First Am.

---

[1] By order filed July 16, 2019, the court took the motions under submission.

Compl. ("FAC"), filed Dec. 19, 2018, ¶ 3.)  He also alleges that four retailers, namely, defendants Lucky Stores, Inc. ("Lucky"), Save Mart Super Markets ("Save Mart"), Save Mart Companies, Inc. ("SMCI"), and The Kroger Company ("Kroger"), "sold Coffee-mate at their grocery stores throughout California" (see id. ¶ 4) and that, during the class period, he purchased Coffee-mate from grocery stores owned by said retailers (the "retailers" or "retailer defendants").

According to Beasley, Coffee-mate, during the class period, contained partially hydrogenated oil ("PHO"), which is an "[a]rtificial" form of trans fat (see id. ¶ 20) and an "unsafe food additive" (see id. ¶ 3).  In addition, Beasley alleges that, for portions of the class period, Coffee-mate's labels bore "unauthorized nutrient content claims" (see id. ¶ 79), namely, "0g Trans Fat" and/or "IT'S GOOD TO KNOW: 0g TRANS FAT/SERV . . ." (the "'0g Trans Fat' statements" or "'0g Trans Fat' claim(s)") (see id. ¶ 76; see also id. ¶¶ 8, 79), and that "[t]his language was part of an intentional, long-term campaign to deceptively market Coffee-mate as healthful and free of trans fat" (see id. ¶ 77).

Based on the above allegations, Beasley, on October 29, 2018, filed his initial complaint in the Superior Court of California, in and for the County of San Francisco.

On November 26, 2018, defendants removed the case to federal court.[2]

On December 19, 2018, Beasley filed the FAC, in which he asserts six Causes of Action, brought both individually and on behalf of the following two putative classes: (1) a "Class," defined as "[a]ll citizens of California who purchased in California, on or after January 1, 2010, Coffee-mate products containing [PHO]" (see FAC ¶ 149); and (2) a "0g Trans Fat Claim Subclass," defined as "[a]ll citizens of California who purchased in California, on or after January 1, 2010, Coffee-mate containing the nutrient content claim '0g Trans Fat' and containing [PHO]" (see id.).

The first two Causes of Action, brought on behalf of Beasley and the "Class,"

---

[2] On December 21, 2018, Beasley moved to remand the instant action to state court, which motion the Court subsequently denied.  (See Order Den. Mot. to Remand, filed May 10, 2019, at 1.)

1   challenge defendants' manufacturing and distribution of Coffee-mate on the basis that it

2   contains PHO (collectively, the "use claims").[3]  Said causes of action are predicated on,

3   respectively, the "unfair" and "unlawful" prongs (see id. at 27:16 & 28:1) of California's

4   "Unfair Competition Law" ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq., and "Breach

5   of Implied Warranty of Merchantability" (see id. at 29:18).

6        The last four Causes of Action, brought on behalf of Beasley and the "Subclass,"

7   challenge defendants' manufacturing and distribution of Coffee-mate on the basis of the

8   "0g Trans Fat" statements (collectively, the "labeling claims").[4]  Said causes of action are

9   predicated on, respectively, the "unlawful," "fraudulent," and "unfair" prongs (see id. at

10  30:12, 32:18, & 33:3) of the UCL, violation of California's "False Advertising Law" ("FAL"),

11  Cal. Bus. & Prof. Code §§ 17500 et seq. (see id. at 33:23), "Breach of Express Warranty"

12  (see id. at 34:6), and California's "Consumer Legal Remedies Act" ("CLRA"), Cal. Civ.

13  Code §§ 1750 et seq. (see id. at 34:20).

14       By the instant motion to dismiss, defendants seek an order dismissing the above-

15  titled action.  By the instant motion to strike, Nestlé seeks an order striking paragraphs of

16  the FAC alleging it has a "pattern and practice" of misconduct toward consumers.  (See

17  Def. Nestlé's Mot. to Strike ("Nestlé Mot.") at 2:21; see also FAC ¶ 82.)

18                              **DISCUSSION**

19       As noted, defendants bring two separate motions.  The Court will begin with

20  defendants' joint motion to dismiss, then turn to Nestlé's motion to strike.

---

23       [3] To the extent the First Cause of Action, which challenges the use of PHO in Coffee-mate as "unsafe" (see FAC ¶ 176), references state-law provisions that pertain to labeling, advertising, and misbranding (see id. ¶ 177), such references are duplicative of allegations in the Third Cause of Action (see id. ¶ 193) and appear to be misplaced.

25       [4] Although differentiation of the Causes of Action into "use" and "labeling" claims is not clear from the FAC, the parties treat them as two separate groups of claims.  (See, e.g., Defs.' Mot. to Dism. Pl.'s FAC ("Mot."). at 1:5–6 (distinguishing between "use claims" and "advertising claims"); Pl.'s Opp'n to Mot. to Dism. ("Opp'n") at 1–3 (arguing content and "use[]" of PHO as basis for first two causes of action), id. at 3–4 (arguing "0g Trans Fat" statements as basis for "false advertising" claims).)

**A.     Motion to Dismiss**

Defendants challenge Beasley's claims on a number of grounds, some of which apply to a subset of such claims and/or defendants.  In particular, defendants contend the use claims are both preempted and fail on their merits, that all of the labeling claims are barred by statutes of limitations and equitable principles, and that some of the labeling claims fail for lack of a showing of reliance.  In addition, defendants contend the FAC, as a whole, fails to meet the heightened pleading requirements for fraud and that, as to the retailers, Beasley has failed to allege any actionable wrongdoing.

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).  Rule 8(a)(2), however, "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  Consequently, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations."  See id.  Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  See id. (internal quotation, citation, and alteration omitted).

In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint and construe them in the light most favorable to the nonmoving party.  See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).  "To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  "Factual allegations must be enough to raise a right to relief above the speculative level[.]"  Twombly, 550 U.S. at 555.  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  See Iqbal, 556 U.S. at 678 (internal quotation and citation omitted).

Given that defendants challenge the FAC on numerous grounds, and that the parties' objections pertain not only to such grounds but to the motion to dismiss more generally, the Court begins by addressing the objections.

### 1.     Parties' Objections

As noted, both parties have filed objections in connection with the instant motion. In that regard, Beasley objects to defendants' reply brief on multiple grounds, namely, that defendants: (1) have "evaded their page limit" of 15 pages, by including "nearly five pages" of footnotes (see Pl.'s Objs. to Defs.' Reply, filed Jun. 17, 2019, at 1:3–4); (2) "make new arguments on reply" (see id. at 1:12), with respect to preemption and tolling; and (3) "misstate" a decision cited therein (see id. at 2:10).  Defendants, in turn, object to Beasley's objection, and ask that it be stricken, on the basis that it "makes numerous legal arguments" and, consequently, is "an improper sur-reply."  (See Defs.' Obj. to Pl.'s Obj., filed Jun. 18, 2019, at 1:4–5.)

Under the applicable local rule, "[u]nless the Court expressly orders otherwise pursuant to a party's request . . ., the reply brief or memorandum may not exceed 15 pages of text."  See Civ. L. R. 7-4(b).  "Text . . . must be double-spaced with no more than 28 lines per page, except for" specified elements, including "footnotes."  See id. 3-4(c)(2).  In addition, "[o]nce a reply is filed," absent an applicable exception, "no additional memoranda, papers or letters may be filed without prior Court approval."  See id. 7-3(d) (setting forth, as exceptions, "new evidence . . . submitted in the reply" and "a relevant judicial opinion published after the date the opposition or reply was filed").

At the outset, the Court notes that Beasley's response to the reply is, although titled "Objections," more properly characterized as a sur-reply, as it primarily consists of substantive legal arguments, and, as defendants point out, Beasley neither sought nor obtained permission to file a sur-reply.  Further, as such sur-reply includes no objection to newly submitted evidence or any notice of newly decided legal authority, neither exception to Civil Local Rule 7-3(d) applies.  Nevertheless, the Court declines to strike said submission, particularly when, as discussed below, defendants' own filing is not fully

in accordance with the local rules.

Although defendants' reply may technically comply with Civil Local Rule 7-4(b), as it contains 15 pages of text, exclusive of the signature page, it contains 19 footnotes totaling 132 lines, which, at 28 lines per page, comes to 4.7 pages. Moreover, nearly all of the footnotes contain substantive legal argument, many at great length. (See, e.g., Reply at 2 n.1, 10 n.14.) Under such circumstances, defendants' use of footnotes in the reply is inappropriate, and, to the extent defendants have raised arguments in the reply either for the first time or only in footnotes, the Court has not considered them. See Estate of Saunders v. Comm'r of Internal Revenue, 745 F.3d 953, 962 n.8 (9th Cir. 2014) (holding "[a]rguments raised only in footnotes, or only on reply, are generally deemed waived"). Lastly, to the extent Beasley asserts defendants have mischaracterized any cases, the Court, having read those cases, can assess for itself the accuracy of defendants' description without need of further filings.

The Court next considers Beasley's use and labeling claims.

### 2. Use Claims: First and Second Causes of Action

Defendants contend Beasley's use claims, which arise under state law, are barred by the doctrine of conflict preemption. In support thereof, defendants cite to this Court's decision in Backus v. Nestlé USA, Inc., a related case in which the Court found the use claims alleged therein, which likewise challenged the use of PHO in Coffee-mate, preempted. See Backus, 167 F. Supp. 3d 1068, 1074 (N.D. Cal. 2016).

Conflict preemption applies where "compliance with both federal and state regulations is a physical impossibility" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," see Ting v. AT&T, 319 F.3d 1126, 1136 (9th Cir. 2003) (internal quotations and citations omitted); see also Geier v. American Honda Motor Co., Inc., 529 U.S. 861, 873–75 (2000) (holding conflict preemption applies to lawsuits that "prevent or frustrate the accomplishment of a federal objective"; finding "common-law 'no airbag'" claim preempted where, based on various objectives, Department of Transportation ("DOT") regulation provided vehicle

6

manufacturers with range of choices among different passive restraint devices). "Parties seeking to invalidate a state law based on preemption bear the considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law." See Stengel v. Medtronic, Inc., 704 F.3d 1224, 1227 (9th Cir. 2013) (en banc) (internal quotation and citation omitted).

Here, as noted, Beasley's use claims are predicated on the "unfair" and "unlawful" prongs of the UCL (see FAC at 27:16 & 28:1)[5] and on breach of the implied warranty of merchantability (see id. at 29:18),[6] the same theories on which the use claims in Backus were predicated (see Case No. C 15-1963, First Am. Compl., filed June 26, 2015, at 29:6 (alleging use of PHO violated "unfair prong" of UCL); id. at 30:2 (alleging use of PHO violated "unlawful prong" of UCL); id. at 31:9 (alleging use of PHO violated "implied warranty of merchantability")). As also noted, the Court, in Backus, determined the use claims were preempted, see Backus, 167 F. Supp. 3d at 1074, and, as discussed below, Beasley has provided the Court with no reason to alter its prior determination.

The relevant federal law is the Food, Drug, and Cosmetic Act ("FDCA"), which prohibits, inter alia, "[t]he introduction or delivery for introduction into interstate commerce of any food . . . that is adulterated," see 21 U.S.C. § 331(a), and "[t]he receipt in interstate commerce of any food . . . that is adulterated . . ., and the delivery or proffered delivery thereof," see id. § 331(c). A food is deemed adulterated "if it is or if it bears or contains . . . any food additive that is unsafe within the meaning of section 348 of this title [21

---

[5] The UCL "prohibits . . . unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.'" See Kwikset Corp. v. Sup. Ct., 51 Cal.4th 310, 320 (2011) (citing Cal. Bus. & Prof. Code § 17200); see also Kearns v. Ford Motor Co., 567 F.3d 1120, 1127 (9th Cir. 2009) (holding "[e]ach prong of the UCL is a separate and distinct theory of liability").

[6] Although Beasley does not identify, in the FAC, the legal basis for his implied warranty claim, he relies on two statutes in his opposition. (See Opp'n at 2:11.) Under said statutes, "a warranty that . . . goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind," see Cal. Com. Code § 2314(1), and goods are "merchantable" if they are "fit for the ordinary purposes for which such goods are used," see id. § 2314(2)(c); see also Cal. Civ. Code § 1791.1(a)(2).

7

U.S.C. § 348]," see id. § 342(a)(2)(C)(i). A food additive, in turn, is deemed unsafe unless, in pertinent part, it complies with "a regulation issued under this section [21 U.S.C. § 348] prescribing the conditions under which such additive may be safely used." See id. § 348(a)(2).

On June 17, 2015, the FDA published a final determination and declaratory order, finding "there is no longer a consensus among qualified experts" that PHOs "are generally recognized as safe (GRAS) for any use in human food," see Final Determination Regarding Partially Hydrogenated Oils ("Final Determination"), 80 Fed. Reg. 34650-01, 34650 (June 17, 2018), and that, as a result, PHOs "are food additives subject to" 21 U.S.C. § 348, see id. Pursuant to said order, the FDA "require[d] discontinuation of the use of" PHOs, see id. at 34656, and set a "compliance date" of June 18, 2018, see id. at 35653, 34668–69 (explaining three-year compliance deadline would provide time for "submission and review of food additive petitions" for PHOs and time to address challenges in "reformulat[ing] products to remove PHOs").[7]

Thereafter, Congress passed the Consolidated Appropriations Act for 2016, which provides that "[n]o [PHOs] as defined in the [Final Determination] shall be deemed unsafe within the meaning of section 409(a) [21 U.S.C. § 348(a)] and no food that is introduced or delivered for introduction into interstate commerce that bears or contains a [PHO] shall be deemed adulterated under section[] . . . 402(a)(2)(C)(i) [21 U.S.C. § 342(a)(2)(C)(i)] by virtue of bearing or containing a [PHO] until the compliance date as specified in such order (June 18, 2018)." Consol. Appropriations Act, 2016, Pub. L. 114-113 § 754, 129 Stat. 2242 (Dec. 18, 2015) ("§ 754").[8]

_____

[7] The FDA subsequently extended said compliance date "for certain uses of PHOs." See Final Determination Regarding Partially Hydrogenated Oils, 83 Fed. Reg. 23358-01, 23358 (May 21, 2018). As the parties do not contend such extension is relevant to the instant case, the Court does not address it further herein.

[8] Subsequently, Congress passed the Consolidated Appropriations Act, 2018, which contains a provision that is identical to § 754 in all respects except for the addition of a phrase identifying "section 409(a)" as part of the FDCA and providing the corresponding citation to the United States Code. See Consol. Appropriations Act, 2018, Pub. L. 115-141 § 738, 132 Stat. 348 (Mar. 23, 2018). No party contends said provision

8

Here Beasley's use claims challenge the sale of PHO-containing Coffee-mate, "on or after January 1, 2010." (See FAC ¶ 149.) As in <u>Backus</u>, such claims "would effectively negate the FDA's order setting a compliance date in 2018," see <u>Backus</u>, 167 F. Supp. 3d at 1072, and "conflict with Congress's decision not to deem PHOs unsafe, or the food containing them adulterated, pending the June 18, 2018, compliance date set by the FDA," <u>see</u> <u>id.</u> at 1074. Beasley's arguments to the contrary are not persuasive.

At the outset, as defendants point out, Beasley reiterates a number of arguments made in <u>Backus</u>. In particular, Beasley relies on the "presumption against preemption" (<u>see</u> Opp'n at 12:7) and contends that: (1) the FDA, in the Final Determination, "disclaimed preemption of state prohibitions or limits on PHO use" (<u>see</u> <u>id.</u> at 13:4–5); (2) the FDA, having determined PHO is not GRAS, "lack[ed] the statutory authority to . . . authorize the sale of PHO" (<u>see</u> <u>id.</u> at 13:12) (emphasis omitted) and, consequently, the compliance period entailed "a question of enforcement discretion, not legality" (<u>see</u> <u>id.</u> at 13:11); (3) § 754 merely "regulate[s] what the FDA may do between the date of its passage, December 15, 2015[,] and June 18, 2018" (<u>see</u> <u>id.</u> at 11:2–3); and (4) § 754 does not "apply retroactively," i.e., prior to the Final Determination (<u>see</u> <u>id.</u> at 11:12). In <u>Backus</u>, the Court, while acknowledging the presumption against preemption, <u>see</u> <u>Backus</u>, 167 F. Supp. 3d at 1070–71, nonetheless found the use claims preempted. In reaching such conclusion, the Court expressly rejected the first two arguments set forth above, as to the FDA's asserted disclaimer and lack of authority, <u>see</u> <u>id.</u> at 1073 (noting FDA "'declined to take a position'" as to preemptive effect of Final Determination; finding argument FDA lacked authority to authorize use of PHO "mooted" by enactment of § 754, "by which Congress essentially ratified" Final Determination), and implicitly rejected the latter two arguments, as to the scope of § 754.

Significantly, Beasley has not provided the Court with any authority or other reason to suggest its conclusion in <u>Backus</u> was incorrect or that it should reach a

_____

differs in any substantive respect from § 754.

different conclusion in the instant case.  First, to the extent Beasley now argues the existence of federal regulations "permitting a food is not grounds for conflict preempting a state law that imposes heavier regulations or prohibits the same food" (see Opp'n at 8:2–3), the cases he cites in support of such proposition are inapposite, as each said case considered whether a broadly applicable federal law governing an industry preempted a narrower state law prohibiting specific conduct not encompassed by the broader statute. See, e.g., Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra, 870 F.3d 1140, 1153 (9th Cir. 2017) (finding no conflict between federal poultry law regulating establishments where slaughter and processing occur and state law prohibiting force-feeding ducks and geese); Chinatown Neighborhood Ass'n v. Harris, 794 F.3d 1136, 1139–43 (9th Cir. 2015) (finding no conflict between federal law vesting "exclusive fishery management authority" in federal government and state law making it a misdemeanor to sell detached shark fins within state).  The instant case, by contrast, presents the inverse of such circumstances, a situation where the plaintiff relies on a broadly applicable state law to challenge specific conduct expressly permitted under federal law.

Next, Beasley's reliance on Hawkins v. Kroger Co., 2019 WL 1506845 (S.D. Cal. 2019), is misplaced.  In Hawkins, as in the instant case, the plaintiff brought both use and labeling claims, challenging the use of PHO in a food product and the "0g Trans Fat" statement on the packaging.  See id. at *1.  Although, as Beasley points out, the Ninth Circuit found the plaintiff's "label claims are not preempted," and instructed the district court to consider, on remand, "whether the use claims are preempted," see Hawkins v. Kroger Co., 906 F.3d 763, 773 (9th Cir. 2018) (noting "[t]he preemption issue was not fully briefed on appeal"), the district court's decision on remand appears to address preemption only with respect to the labeling claims, see Hawkins, 2019 WL 1506845, at *4 (holding "0g Trans Fat" statement "made outside the nutrition label[] is not preempted"; distinguishing, as a "line of authority address[ing] a different issue than that before the court," cases holding use claims preempted).  In any event, even assuming the district court did conclude the use claims were not preempted, this Court, for the reasons stated

10

1  above, disagrees. Moreover, numerous other district courts, faced with similar

2  arguments as those presented here, have likewise found claims challenging the use of

3  PHO preempted. See, e.g., Beasley v. Conagra Brands, Inc., 374 F. Supp. 3d 869, 874–

4  78 (N.D. Cal. 2019) (holding conflict preemption barred UCL and implied warranty of

5  merchantability claims challenging use of PHOs in popcorn snack prior to June 18, 2018;

6  rejecting plaintiff's arguments as to presumption, enforcement discretion, and scope of

7  § 754); Backus v. General Mills, Inc., 2018 WL 6460441, at *3–6 (N.D. Cal. 2018)

8  (holding conflict preemption barred UCL claims challenging use of PHO in baking mix

9  products; rejecting plaintiff's arguments as to presumption and scope of § 754); Backus v.

10  Biscomerica Corp., 2017 WL 1133406, at *2–4 (N.D. Cal. 2017) (holding conflict

11  preemption barred UCL claims challenging use of PHO in packaged cookies; rejecting

12  plaintiff's arguments as to enforcement discretion and FDA's view regarding preemptive

13  effect of Final Determination).

14      In sum, faced with the same type of use claims, the same regulatory and statutory

15  framework, and, by and large, the same arguments, the Court concludes Beasley's use

16  claims, like those in Backus, are preempted. See Backus, 167 F. Supp. 3d at 1074.

17      Accordingly, the First and Second Causes of Action are subject to dismissal.[9]

18      **3.    Labeling Claims: Third Through Sixth Causes of Action**

19      As noted, Beasley's labeling claims challenge, as false and misleading, the "0g

20  Trans Fat" statements on Coffee-mate labels, and are brought under four causes of

21  action: the UCL, the FAL, breach of express warranty, and the CLRA.

22      Under the UCL, as set forth above, "any unlawful, unfair or fraudulent business act

23  or practice" is prohibited. See Cal. Bus. & Prof. Code § 17200. Beasley invokes all three

24  prongs of the UCL.

25      The FAL makes it "unlawful for any person, . . . with intent directly or indirectly to

26

27          [9] In light of such ruling, the Court does not address herein defendant's additional

28  arguments in support of dismissal of the first two causes of action.

11

dispose of . . . property . . ., to make or disseminate or cause to be made or disseminated before the public in this state . . . any statement, concerning that . . . property . . ., which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." See id. § 17500.

The CLRA prohibits specified "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale . . . of goods . . . to any consumer." See Cal. Civ. Code § 1770(a).[10]

Defendants seek to dismiss Beasley's labeling claims on multiple bases, namely, failure to comply with Federal Rule of Civil Procedure Rule 9(b), failure to meet limitations periods, failure to plead reliance on the challenged statement, "principles of equity" (see Mot. at 13:18), and, with respect to the retailer defendants, failure to allege "any actionable wrongdoing" (see id. at 15:21). The Court addresses each such basis in turn.

### a.    Rule 9(b)

Defendants contend the FAC "fails to meet the heightened pleading requirements of Rule 9(b)." (See Mot. at 14:14–15.) In particular, they argue Beasley has not provided "the basic details" of his Coffee-mate purchases (see id. at 14:25), including when he purchased Coffee-mate, the "type/flavor" he purchased (see id. at 15:1), and "how and why he relied on" the "0g Trans Fat" statements (see id.).

Where a party alleges fraud, Rule 9(b) requires the party to "state with particularity the circumstances constituting fraud." See Fed. R. Civ. P. 9(b); see also Kearns, 567 F.3d at 1125 (holding, if plaintiff alleges "a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of [a] claim, . . . the claim is said to

---

[10] Beasley does not identify, in either the FAC or his opposition, the statute or other legal basis for his breach of warranty claim. The Court notes, however, that, under the California Commercial Code, "[e]xpress warranties are created by the seller" under specified circumstances. See Cal. Com. Code § 2313(1)(a)–(b) (providing, inter alia, for express warranty based on "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" and "[a]ny description of the goods which is made part of the basis of the bargain").

be 'grounded in fraud[,]' . . . and the pleading . . . as a whole must satisfy the particularity requirement of Rule 9(b)").

Beasley does not dispute that Rule 9(b) applies to his labeling claims but, rather, contends he has met the rule's requirements. Moreover, a review of the FAC shows Beasley repeatedly alleges defendants engaged in fraudulent conduct in using the "0g Trans Fat" statements. (See, e.g., FAC ¶ 8 (alleging "[d]efendants . . . defrauded the class" by using "0g Trans Fat" claim); id. ¶ 195 (alleging, with respect to "unlawful" prong of UCL, "[d]efendants leveraged their deception to induce" purchases of Coffee-mate); id. ¶ 205 (alleging, with respect to "unfair" prong of UCL, "[d]efendants . . . advertised [Coffee-mate] in a fraudulent manner")).)

"To satisfy Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent] statement, and why it is false." Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011) (alteration in original; internal quotation and citation omitted).

Here, Beasley alleges that: (1) "[d]uring the class period . . ., Nestle unlawfully made Coffee-mate with" PHO (see FAC ¶ 3); (2) he "repeatedly purchased Coffee-mate for personal and household consumption" (see id. ¶ 19); (3) he "purchased Coffee-mate during the class period approximately once per month" (see id. ¶ 71); (4) he "purchased . . . Coffee-mate from the grocery stores owned by [d]efendants Lucky, Save Mart, SMCI, and Kroger during the class period" (see id. ¶ 9), the "most frequent locations" of such purchases being a "Foods Co" store in San Francisco and a Lucky store in San Bruno (see id. ¶ 72; see also id. ¶ 19); (5) such purchases "included both the liquid and powder versions of Coffee-mate" (see id. ¶ 71); (6) "[d]uring much of the class period, Coffee-mate was made with PHO yet contained the deceptive health and wellness claim '0g Trans Fat'" (see id. ¶ 76; see also id. ¶ 8); (7) he "relied on Nestle's '0g Trans Fat' claim as a substantial factor in some of his purchases" (see id. ¶ 75); (8) "on at least one occasion, [he] would not have purchased Coffee-mate absent" the "0g Trans Fat" claim

13

(see id. ¶ 144); and (9) "in January 2017, . . . he learned that Coffee-mate contained an unsafe food additive for years and was fraudulently marketed" (see id. ¶ 73). As discussed below, the Court finds the FAC does not meet the requirements of Rule 9(b).

At the outset, the Court notes that, although Beasley alleges the class period began "on or after January 1, 2010" (see id. ¶ 149), he does not allege a corresponding end date. Consequently, Beasley's purchases could have occurred any time between January 1, 2010, and October 29, 2018, the date Beasley filed his initial complaint in state court, a period of nearly nine years.

Given such time span, Beasley's allegations that he "repeatedly" purchased Coffee-mate (see id. ¶ 19) and purchased the product "during the class period once per month" (see id. ¶ 71) are too general to satisfy the "when" requirement of Rule 9(b). See Yumul v. Smart Balance, Inc., 733 F. Supp. 2d 1117, 1124 (C.D. Cal. 2010) (finding allegation plaintiff "repeatedly" purchased product during class period of 10.5 years insufficient to satisfy Rule 9(b)). In particular, the Court cannot determine from said allegations when Beasley purchased Coffee-mate, including whether he purchased it throughout the entire class period or only for a portion of the period and, if the latter, what portion thereof.

Moreover, Beasley does not allege when, during the class period, Coffee-mate contained PHO,[11] when its labeling contained the "0g Trans Fat" claim, when he relied on such claim, or from which retailer(s) he purchased Coffee-mate in any such instance. See, e.g., id. at 1124 (finding plaintiff did not allege "when during the [class] period . . . she saw" representations at issue). Further, it is unclear from the FAC whether the inclusion of PHO and/or the "0g Trans Fat" claim varied across different forms or flavors of Coffee-mate. See id. (finding plaintiff did not allege product packaging "remained

---

[11] Although Beasley alleges that, "[u]nless otherwise stated, references to Coffee-mate only include Coffee-mate during the period it contained PHO" (see FAC ¶ 3) and further alleges Nestlé "now uses 'soybean and/or canola oil,' neither of which contain[s] trans fat, as a substitute for PHO in the current formulation" of Coffee-mate (see id. ¶ 80), he does not allege when Nestlé stopped using PHO in Coffee-mate.

consistent throughout" class period; noting packaging "may have changed over the course of" said period).[12]  Such deficiencies are particularly significant in light of Beasley's acknowledgment that he relied on the "0g Trans Fat" claim for only "some" of his purchases (<u>see</u> FAC ¶ 75), and that, for at least some portion of the class period, Coffee-mate did not contain PHO and/or did not bear the "0g Trans Fat" claim (<u>see, e.g.</u>, <u>id.</u> ¶¶ 8, 76 (alleging Coffee-mate contained PHO yet bore "0g Trans Fat" claim during "much of the class period"); <u>see also</u> <u>Beasley</u>, 374 F. Supp. 3d at 882 (finding allegations showing plaintiff purchased product containing PHO "at some time during an 8.5 year window" insufficient under Rule 9(b), "particularly where the complaint lack[ed] allegations" as to when use of PHO was discontinued; explaining "if plaintiff purchased [product] after . . . it stopped containing PHOs, he would have no claim").

Lastly, as discussed below, some or all of Beasley's purchases may fall outside the applicable statutes of limitations.  Beasley "must plead when he bought the PHO-containing [Coffee-mate] with greater specificity in order that the Court may fairly evaluate the question of timeliness."  <u>See</u> <u>Beasley</u>, 374 F. Supp. 3d at 882.

In sum, Beasley's allegations as to when he purchased Coffee-mate are insufficient, and, accordingly, the Court finds the Third through Sixth Causes of Action are subject to dismissal for failure to satisfy the requirements of Rule 9(b).  <u>See</u> <u>id.</u> (dismissing labeling claims for failure to comply with Rule 9(b)).

### b.    Timeliness

Defendants contend Beasley's labeling claims are time-barred because, according to defendants, the "0g Trans Fat" statement was "removed outside of the limitations period."  (<u>See</u> Mot. at 10:9–10.)  In particular, defendants argue that, "[a]t best for [Beasley], the statute of limitations . . . bars claims that accrued prior to October 29,

---

[12] Although the FAC includes partial depictions of Coffee-mate labeling bearing the statement "0g Trans Fat" or "0g Trans Fat/SERV" (<u>see</u> FAC ¶ 76), the Court cannot determine from the depictions when such labeling was in use, nor whether it was used on all Coffee-mate products.  <u>See, e.g.</u>, <u>Yumul</u>, 733 F. Supp. 2d at 1124 n.8 (noting plaintiff did not allege when manufacturer "used the packaging depicted").

1    2014" (see id. at 9:12–13), for the asserted reason that, as of February 2012 and July

2    2013, respectively, "no labels produced for Coffee-mate" powder products and liquid

3    products contained the challenged statement (see id. at 9:13).  In support of such

4    assertion, defendants have submitted a declaration by Rena Kashmere, a Nestlé

5    employee (see Decl. of Rena Kashmere, filed May 23, 2019 ("Kashmere Declaration")),

6    together with a Request for Judicial Notice of two exhibits depicting Coffee-mate product

7    labels (see Defs.' Req. for Jud. Notice, filed May 23, 2019; see also Kashmere Decl. Exs.

8    1–2).

9            Beasley responds that the statute of limitations issue is an affirmative defense that

10   "cannot be resolved at this stage" of the proceedings (see Opp'n at 16:2) because: (1)

11   the FAC does not contain the requisite facts to prove such defense; (2) the Kashmere

12   Declaration is "extrinsic evidence" (see id. at 16:17);[13] and (3) he "adequately pleaded

13   delayed discovery" (see id. at 17:1).

14                              **(1)    Statutes of Limitations**

15           In the instant case, Beasley's labeling claims are, depending on the particular

16   statute on which Beasley relies, subject to either a three-year or four-year limitations

17   period.  See Cal. Code Civ. Proc. § 338(a) (providing three-year limitations period for FAL

18   claims); Cal. Civ. Code § 1783 (providing three-year limitations period for CLRA claims);

19   Cal. Bus. & Prof. Code § 17208 (providing four-year limitations period for UCL claims);

20   Cal. Com. Code § 2725(1) (providing four-year limitations period for breach of express

21   warranty claims); see also Beasley, 374 F. Supp. 3d at 882 (holding, with respect to

22   labeling claims brought pursuant to the FAL, CLRA, and UCL and for breach of express

23   warranty, "[t]he operative statutes provide for three[-] or four-year limitations periods";

24   citing above-referenced statutory provisions).  As Beasley filed his initial complaint on

25   October 29, 2018, the limitations period goes back three years, to October 29, 2015, for

26

27           _____

28           [13] The Court understands Beasley's objection to the Kashmere Declaration to
     include the exhibits it purports to authenticate.

1   his FAL and CLRA claims, and four years, to October 29, 2014, for his UCL and breach

2   of warranty claims.

3       As noted, Beasley alleges a class period that dates back to January 1, 2010, more

4   than four years before October 29, 2014, and more than five years before October 29,

5   2015.  Consequently, it appears from the FAC that at least some, and perhaps all, of

6   Beasley's labeling claims may be time-barred.  The Court cannot determine from the

7   FAC, however, whether any or all of Beasley's purchases fell outside the limitations

8   periods, given the lack of specificity as to when and which type of Coffee-mate products

9   he purchased, and whether those products, at the time of purchase, contained PHO and

10  bore the challenged labeling statement.  Accordingly, the Court cannot, based on the

11  FAC, find Beasley's labeling claims are time-barred.

12      Nor can the Court rely on the Kashmere Declaration or its attached exhibits to

13  make such a finding.  For the reasons set forth below, the Court finds the declaration

14  constitutes extrinsic evidence not properly considered on a motion to dismiss and that,

15  contrary to defendants' contention (see Defs.' Req. for Jud. Not. at 1–3), the exhibits

16  depicting product labels (see Kashmere Decl. Exs. 1–2) are not subject to judicial notice

17  under the "incorporation by reference" doctrine.

18      Generally, a district court, in ruling on a Rule 12(b)(6) motion, "may not consider

19  any material beyond the pleadings."  See Hal Roach Studios, Inc. v. Richard Feiner &

20  Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).  Pursuant to the doctrine of

21  "incorporation by reference," however, courts may consider "documents whose contents

22  are alleged in a complaint and whose authenticity no party questions, but which are not

23  physically attached to the [plaintiff's] pleading."  See Knievel v. ESPN, 393 F.3d 1068,

24  1076 (9th Cir. 2005) (alteration in original; internal quotation and citation omitted).

25      Here, the Kashmere Declaration states that: (1) "[n]o later than July 2013, none of

26  the labels produced for Coffee-mate liquid products contained a '0g Trans Fat' statement

27  on the front panel of the label" (see Kashmere Decl. ¶ 5); (2) "[n]o later than February

28  2012, none of the labels produced for Coffee-mate powder products contained a '0g

17

Trans Fat' statement on the front panel of the label" (see id. ¶ 4); (3) "[t]he Coffee-mate labels pictured on page 13 (¶ 74) of the [initial] complaint are labels that were introduced . . . in the 2008–2009 time frame" and that "have been superseded several times since, including [by] the removal of the '0g Trans Fat' statement in 2012 and 2013" (see id. ¶ 8); and (4) "[c]urrently," no Coffee-mate labels, whether for liquid or powder versions of the product, "contains a '0g Trans Fat' statement on the front panel" (see id. ¶¶ 6–7).  In addition, the declaration identifies Exhibits 1 and 2 as copies of the labels for liquid and powder products, respectively, that were "in market"[14] during the time period of "January 2014 to the present" and "January 2013 to the present," respectively.  (See id. ¶¶ 6–7.)

Significantly, none of the above-referenced factual assertions are contained in the FAC, and, as Beasley points out, they constitute evidence to which Nestlé "has privileged access," but as to which he "has had no ability to conduct discovery."  (See Opp'n at 16:18–19.)  Further, the labels depicted in Exhibits 1 and 2 (see Kashmere Decl. Ex. 1 at 2–4; id. Ex. 2 at 2) differ from those depicted in the FAC (see FAC ¶ 76 at 13–14), and none of the depictions, either in the exhibits or in the FAC, display any dates.

Given the above circumstances, the Court does not consider, for purposes of the instant motion, either the Kashmere Declaration or the exhibits referenced therein.  Nevertheless, because, as noted, it appears from the FAC itself that at least some of the claims may be time-barred, and because the FAC includes a section on delayed discovery, the Court next turns to the delayed discovery rule.

### (2)    Delayed Discovery Rule

Under California law, "to rely on the discovery rule for delayed accrual of a cause of action," the plaintiff "must specifically plead facts to show (1) the time and manner of

---

[14] It is unclear what defendants mean by the phrase "in market."  The declaration identifies the approximate dates Nestlé stopped producing labels with "a '0g Trans Fat' statement," which says nothing about when it stopped using such labels or when any of the defendants stopped selling Coffee-mate products bearing such labels.  Moreover, as noted, defendants refer only to the "front panel" of the label (see, e.g., Kashmere Decl. ¶¶ 4–5), whereas the FAC also relies on statements located "on the back of the product" (see FAC ¶ 76 at 12:25; see also id. ¶ 76 at 14:1–7).

1   discovery and (2) the inability to have made earlier discovery despite reasonable

2   diligence." Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 808 (2005) (internal

3   quotation, citation, and emphasis omitted). "In assessing the sufficiency of the

4   allegations of delayed discovery, the court places the burden on the plaintiff to show

5   diligence; conclusory allegations will not withstand" a motion to dismiss. See id. (internal

6   quotation and citation omitted).

7        Here, Beasley alleges, he "did not discover" defendants' unlawful conduct "until

8   January 2017, when he learned that Coffee-mate contained, despite its explicit label

9   claim, trans fat, and that trans fat is harmful to human health in any quantity." (See FAC

10  ¶ 146; see also id. ¶ 75 (alleging Beasley "first discovered [d]efendants' unlawful acts . . .

11  in January 2017, when he learned that Coffee-mate contained an unsafe food additive for

12  years and was fraudulently marketed").) In addition, Beasley alleges that, "in the

13  exercise of reasonable diligence, [he] could not have discovered earlier [d]efendants'

14  fraudulent and unlawful acts," as he is "not a nutritionist, food expert, or food scientist, but

15  rather a lay consumer." (See id. ¶ 74; see also id. ¶ 147 (alleging Beasley "does not

16  typically read or have ready access to scholarly journals . . . where the scientific evidence

17  of artificial trans fat's dangers has been published"; further alleging "Nestle's labeling

18  practices—in particular, representing for many years that Coffee-mate has '0g Trans

19  Fat'—actively impeded [his] . . . abilit[y] to discover the dangerous effects of Coffee-mate

20  throughout the class period").)

21       Although Beasley has pled the time of his discovery, he has failed to plead the

22  manner thereof, as he merely identifies "January 2017" as the date he "learned" (see id.

23  ¶¶ 73, 146) about "the facts of his claims" (see id. ¶ 146). Further, his alleged lack of

24  expertise is, without more, insufficient to support his assertion that he could not have

25  discovered those facts earlier.

26       Accordingly, the Court finds Beasley has not pled sufficient facts to invoke the

27  delayed discovery rule. See Fox, 35 Cal. 4th at 808; see also Beasley, 374 F. Supp. 3d

28  at 883 (finding, where plaintiff "allege[d] no facts regarding the manner" of discovery, "his

19

1  statements that he could not have made his discovery sooner are nothing more than

2  conclusory").[15]

3            **c.    Standing: Reliance Element**

4        Defendants also challenge Beasley's statutory standing to bring two of his labeling

5  claims, namely, his UCL and FAL claims, on the basis that Beasley "has not plausibly

6  alleged that the ['0g Trans Fat'] statement was an 'immediate cause' of his purchase."

7  (See Mot. at 13:15–16 (citation omitted).)

8        To have standing to pursue a claim under the UCL or FAL, a party must: "(1)

9  establish a loss or deprivation of money or property sufficient to qualify as injury in fact,

10  i.e., economic injury[;] and (2) show that that economic injury was the result of, i.e.,

11  caused by, the unfair business practice or false advertising that is the gravamen of the

12  claim."  See Kwikset Corp., 51 Cal.4th at 322 (emphasis omitted).[16]  With respect to the

13  second element, in a case "based on a fraud theory," see id. at 326 (internal quotation

14  and citation omitted), a plaintiff "proceeding on a claim of misrepresentation . . . must

15  demonstrate actual reliance on the allegedly deceptive or misleading statements," see id.

16  at 326–27 (internal quotation and citation omitted) (explaining plaintiff "must show that the

17  misrepresentation was an immediate cause of the injury-producing conduct" (internal

18  quotation and citation omitted)).

19        According to defendants, Beasley has conceded that, prior to January 2017, he

20  was unaware "'that trans fat is harmful to human health'" (see Mot. at 13:3–4 (quoting

21  FAC ¶ 146)), and, consequently, defendants argue, neither "the amount of trans fat in

22  Coffee-mate" nor the "0g Trans Fat" claim could have been "material" to his purchasing

23

24        [15] Although Beasley argues the running of the statute of limitations was "toll[ed]"
   during the pendency of the Backus putative class action (see Opp'n at 21–22), the FAC
25  includes no allegations to support such finding, nor does Beasley ask the Court to take
   judicial notice of any facts relevant thereto.  Accordingly, the Court does not address said
26  issue further herein.

27        [16] Defendants do not contend Beasley failed to allege economic injury, and the
   Court finds such element satisfied.  (See FAC ¶ 145 (alleging Beasley "suffered loss in
28  an amount equal to the amount he paid for Coffee-mate").)

1 | decisions (see id. at 13:11–12). In response, Beasley states defendants have

2 | "misquote[d]" the FAC (see Opp'n at 23:1), which, as he points out, "does not allege that

3 | he merely discovered that trans fat is 'harmful to human health' in January 2017, but that

4 | it was harmful 'in any quantity'" (see id. at 23:13-14 (quoting FAC ¶ 146)). Nevertheless,

5 | for the reasons discussed below, the Court finds the allegations in the FAC are

6 | inadequate to plead reliance.

7 | In that regard, the allegations cited in the Court's discussion of Rule 9(b), see

8 | supra § A.3.a., and timeliness, see supra § A.3.b., are in large part also relevant to the

9 | issue of reliance. Although Beasley alleges he relied on the "0g Trans Fat" claim in

10 | purchasing Coffee-mate (see FAC ¶ 75 (alleging Beasley "relied" on such claim "as a

11 | substantial factor in some of his purchases of Coffee-mate"); id. ¶ 144 (alleging Beasley,

12 | "on at least one occasion, would not have purchased Coffee-mate absent" such claim)),

13 | he has not alleged whether those purchases were made before or after January 2017,

14 | the month in which he allegedly learned the inclusion of trans fat in any amount was

15 | harmful. Moreover, Beasley's allegation that he "was seeking a product made with safe

16 | and lawful ingredients" (see id. ¶ 140) does not suffice to allege he was seeking to

17 | purchase a product without any trans fat, nor does he otherwise draw a connection

18 | between the "0g Trans Fat" statements and his decision to purchase Coffee-mate.

19 | Under such circumstances, the Court finds the Third and Fourth Causes of Action

20 | are subject to dismissal on the above-discussed additional ground as well.

21 | **d. Principles of Equity**

22 | Defendants make an additional argument that Beasley's labeling claims are

23 | "bar[red]" by "[p]rinciples of equity." (See Mot. at 13:18.) In that regard, defendants rely

24 | on two district court decisions in which the plaintiffs' challenges to "0g Trans Fat" labeling

25 | were found preempted, see Carrea v. Dreyer's Grand Ice Cream, Inc., 2011 WL 159380,

26 | at *4 (N.D. Cal. 2011), aff'd, 475 F. App'x 113, 116 (9th Cir. 2012); see also Backus, 167

27

28

F. Supp. 3d at 1076,[17] and contend that, given such rulings, Nestlé had "every reason and right . . . to conclude that its products could legally bear [the '0g Trans Fat'] label claim at the time that it made labeling decisions regarding Coffee-mate packaging" (see Mot. at 14:11–13 (emphasis omitted)).

As Beasley points out, defendants have not cited to any authority acknowledging such an "equity" argument, and the Court finds defendants' asserted reliance thereon unpersuasive.

### e.    Retailer Defendants

As alleged against the retailers, defendants contend Beasley's claims fail for the additional reason that the FAC "does not allege any actionable wrongdoing on their part." (See Mot. at 15:21–22.)  In particular, defendants argue, Beasley does not allege the retailers "were involved with or had any control over the labels that Nestle used on its products" (see id. at 16:1–2) and that he cannot hold the retailers "vicariously liable for allegedly false statements attributable to the manufacturer" (see id. at 16:15–16).

Relying on the "unlawful" prong of the UCL, Beasley contends he has alleged the retailers' "sale of Coffee-mate violated" California law.  (See Opp'n at 5:23–24 (emphasis in original).)  In particular, Beasley cites four provisions of the Sherman Food, Drug, and Cosmetic Law ("Sherman Law") pertaining to false advertising and misbranding, which Beasley characterizes as "strict liability statutes" that "explicitly place equal duties on manufacturers and sellers of foods."  (See id. at 5:7–8.)

In proscribing "unlawful" business practices, the UCL "borrows violations of other laws and treats them as unlawful practices" that it makes "independently actionable." See Cel-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co., 20 Cal.4th 163, 181 (1999) (internal quotation and citation omitted).  A UCL claim, however, "cannot be predicated on vicarious liability," see Emery v. Visa Int'l Serv. Ass'n, 95 Cal. App. 4th 952, 960

---

[17] The preemption holding was later abrogated.  See Hawkins, 906 F.3d at 771–72 & n. (rejecting reasoning in Carrea).

1  (2002); rather, "[a] defendant's liability must be based on his personal participation in the

2  unlawful practices and unbridled control over the practices that are found to violate" the

3  UCL, see id. (internal quotation and citation omitted).

4      The provisions of the Sherman Law upon which Beasley relies make it "unlawful

5  for any person" to: (1) "manufacture, sell, deliver, hold, or offer for sale any food . . . that

6  is "falsely advertised," see Cal. Health & Safety Code § 110395; (2) "receive in commerce

7  any food . . . that is falsely advertised or to deliver or proffer for delivery any such food,"

8  see id. § 110400; (3) "manufacture, sell, deliver, hold, or offer for sale any food that is

9  misbranded," see id. § 110760; and (4) "receive in commerce any food that is

10  misbranded or to deliver or proffer for delivery any such food," see id. § 110770.

11      The above-cited provisions do not, by their own terms, restrict liability to

12  manufacturers,[18] and the FAC, while not a model of clarity, does allege the retailers

13  "unlawfully sold Coffee-mate at their grocery stores" (see FAC ¶ 4), for which sales,

14  Beasley has clarified in his opposition, he seeks to hold the retailers liable (see Opp'n at

15  5:23–24).  Moreover, provisions similar to those on which Beasley relies have been

16  applied to sellers other than manufacturers.  See, e.g., Farm Raised Salmon Cases, 42

17  Cal.4th 1077, 1083–84, 1090 (2008) (reversing dismissal of UCL claims that were

18  predicated on Sherman Law food-labeling provisions, where plaintiffs alleged grocery

19  stores sold salmon without disclosing use of color additives by fish farmers); People v.

20  Beggs, 69 Cal. App. 2d Supp. 819, 821–22 (1945) (affirming Sherman Law convictions of

21  non-manufacturer defendants who sold onions in sacks bearing labels that

22  misrepresented their weight, notwithstanding defendants' lack of knowledge as to

23  misrepresentation).  By contrast, the cases on which defendants rely either make no

24  reference to the Sherman Law, see, e.g., Herron v. Best Buy Co., Inc., 924 F. Supp. 2d

25  1161, 1168–69 (E.D. Cal. 2013) (addressing alleged misrepresentation pertaining to

---

27      [18] Defendants do not contend the retailers are immune from prosecution under the
Sherman Law, see Cal. Health & Safety Code § 110245, nor do they invoke any
28  exception thereunder, see, e.g., id. § 110385.

battery life of laptop), or were decided on an issue other than retailer liability, see, e.g., Brazil v. Dole Packaged Foods, LLC, 660 F. App'x 531, 534 (9th Cir. 2016) (affirming dismissal of Sherman Law claim brought against producer of allegedly mislabeled packaged fruit, on ground plaintiff "did not see" misrepresentation prior to purchase; also describing as "outlandish" any suggestion consumer could be held liable for receiving mislabeled product).

Consequently, although, as discussed in earlier sections, the claims against the retailer defendants are subject to dismissal, those claims are not subject to dismissal on the above-discussed additional ground.

### 4. Leave to Amend

In his opposition, Beasley requests leave to amend "to correct any errors or deficiencies the Court finds." (See Opp'n at 24:15.) Defendants seek dismissal of the entire case with prejudice.

Pursuant to Federal Rule of Civil Procedure 15, a "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "Dismissal without leave to amend is improper unless it is clear . . . that the complaint could not be saved by any amendment." Missouri ex rel. Koster v. Harris, 847 F.3d 646, 655–56 (9th Cir. 2017) (internal quotation and citation omitted). Leave to amend is properly denied, however, "where the amendment would be futile." See id. at 656 (internal quotation and citation omitted) (explaining amendment is futile "when no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense" (internal quotation and citation omitted)).

Here, with respect to Beasley's use claims, given the Court's finding as to preemption, any amendment would be futile. With respect to the labeling claims, however, it is not clear the FAC could not be saved by amendment. Accordingly, the Court will deny Beasley's request to amend as to the First and Second Causes of Action, and grant the request as to the Third through Sixth Causes of Action.

24

**B.** **Motion to Strike**

Nestlé moves to strike in their entirety paragraphs 82–126 of the FAC, a section wherein Beasley alleges Nestlé has "a pattern and practice of oppressive and unlawful conduct toward consumers" (see FAC ¶ 82), which allegations, Nestlé contends, are "immaterial, impertinent, and scandalous" (see Nestlé Mot. at 2:22). In response, Beasley argues said allegations show "Nestle's practice of knowing disregard for the health and safety of consumers" (see Pl.'s Opp'n to Mot. to Strike, filed June 6, 2019 ("Opp'n to Nestlé Mot."), at 7:17) and, consequently, are "relevant to a punitive damages [analysis under the CLRA] or unfair business practice analysis [under the UCL]" (see id. at 7:19–20; see also id. at 1:4–9).

Pursuant to Rule 12(f), "[t]he court may strike from a pleading . . . any . . . immaterial, impertinent, or scandalous matter." See Fed. R. Civ. P. 12(f). "Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded." Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir. 1993) (internal quotation and citation omitted), rev'd on other grounds, 510 U.S. 517 (1994). "Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question." See id. (internal quotation and citation omitted). Scandalous matter "improperly casts a derogatory light on someone." See Sirois v. East West Partners, Inc., 285 F. Supp. 3d 1152, 1162 n.8 (D. Haw. 2018) (internal quotation and citation omitted). "Motions to strike are generally not granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." LeDuc v. Kentucky Cent. Life Ins. Co., 814 F. Supp. 820, 830 (N.D. Cal. 1992).

Here, the challenged paragraphs allege Nestlé: (1) "promot[ed] . . . the ringleaders in a criminal price fixing conspiracy" pertaining to the pricing of chocolate (see FAC at 15:1); (2) "lies to women in developing countries, using saleswomen dressed as nurses, telling them Nestle powder formula is superior to mother's breast milk" (see id. at 16:14–15); (3) "does business with cocoa bean companies that use child slave labor" (see id. at

19:10); (4) has been warned by the Food and Drug Administration ("FDA") that "its Gerber baby foods have 'unauthorized' and 'misleading' label claims and websites" (see id. at 20:12–13); and (5) "targets parents of older children with false and misleading advertising on its diabetes-inducing junk foods" (see id. at 21:12–14) and has received "warning letter[s]" from the FDA in connection therewith (see id. at 21:15–22:1).

As Nestlé points out, none of the above-referenced allegations of misconduct relate to Coffee-mate, the only product at issue, or to Beasley's claims regarding the use of PHO or the "0g Trans Fat" statements, and, contrary to Beasley's contention, the Court finds the challenged allegations do not, for purposes of an award of punitive damages or under the UCL, show conduct "similar" to that at issue.  (See id. at 7:14.)  As relevant to punitive damages, "similar" conduct is conduct that "replicates the prior transgressions," see State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 422–24 (2003) (holding "[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages"; explaining "[a] defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business"), and, as Nestlé points out, Beasley "cites to no case law that establishes a different standard exists for his UCL claim" (see Reply at 3:5–6).  Here, the challenged allegations pertain to products, labeling, and advertising wholly different from that encountered by Beasley.[19]

Lastly, given how far afield the challenged allegations range from the conduct and claims at issue in the instant case, the Court agrees with Nestlé that their inclusion in the FAC serves "solely to prejudice Nestlé by painting it as a bad actor."  (See Nestlé Mot. at 5:5–6.)

In sum, the Court finds the challenged allegations are "immaterial, impertinent, [and] scandalous," see Fed. R. Civ. P. 12(f), and, accordingly, paragraphs 82–126 will be

---

[19] In light of the above finding, the Court does not address herein Nestlé USA's additional argument that the allegations as to price-fixing and infant formula pertain to Nestlé entities other than Nestlé USA.

stricken from the FAC.

**CONCLUSION**

For the reasons stated:

1.     Defendants' Motion to Dismiss is hereby GRANTED, and Beasley is hereby afforded leave to amend his labeling claims to cure the deficiencies identified above.

2.     Nestlé's Motion to Strike is hereby GRANTED.

3.     Beasley's Second Amended Complaint, if any, shall be filed no later than October 7, 2019.  In any Second Amended Complaint, Beasley may, as noted, amend to cure the deficiencies in his labeling claims but may not add new claims or defendants without first obtaining leave of court.  <u>See</u> Fed. R. Civ. P. 15(a)(2); Fed. R. Civ. P. 16(b)(4).

In light of the above, the case management conference, currently scheduled for September 27, 2019, is hereby CONTINUED to January 31, 2020, at 10:30 a.m.  A Joint Case Management Statement shall be filed no later than January 24, 2020.

**IT IS SO ORDERED.**


Dated: September 16, 2019

MAXINE M. CHESNEY
United States District Judge